# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 11-1214

LILLIE M. WINGARD, APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued June 25, 2013                                        Decided August 16, 2013)

*Todd M. Wesche*, of Fort Lauderdale, Florida, for the appellant.

*Thomas E. Sullivan* and *Carolyn Washington*, with whom *Will A. Gunn*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Gayle E. Strommen*, Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before KASOLD, *Chief Judge,* and SCHOELEN and PIETSCH, *Judges*.

SCHOELEN, *Judge*: The appellant, Lillie M. Wingard, the daughter of the deceased veteran, Charlie N. Wingard, appeals through counsel a January 11, 2011, Board of Veterans' Appeals (Board or BVA) decision that denied non-service-connected burial benefits under 38 U.S.C. § 2302. Record of Proceedings (R.) at 3-11.[1] This appeal is timely, and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). This matter was referred to a panel of the Court to address Ms. Wingard's arguments (1) that the requirement that a veteran be "in receipt of compensation" at the time of death pursuant to 38 U.S.C. § 2302(a)(1) includes veterans who were *entitled to receive* compensation at the time of death; and (2) that her deceased father was entitled to receive compensation at the time of his death but for the Secretary's practice of assigning noncompensable evaluations, which Ms. Wingard argues is contrary to the statutory framework for

---

[1] The Board also granted entitlement to a plot or interment allowance, an issue not before the Court. *See Bond v. Derwinski*, 2 Vet.App. 376, 377 (1992) (per curiam order) ("This Court's jurisdiction is confined to the review of final [Board] decisions which are adverse to a claimant.").

the payment of disability compensation for service-connected disabilities under chapter 11 of title 38, U.S. Code, *see* 38 U.S.C. §§ 1110 and 1155.

Because the Court holds that the Secretary's practice of assigning noncompensable evaluations is not inconsistent with the statutory scheme for service-connected disability compensation benefits, and that, therefore, the appellant's argument that Mr. Wingard was entitled to receive compensation at the date of his death fails, we find it unnecessary to resolve the first question, and conclude that the Board did not err in determining that the appellant did not meet the criteria for non-service-connected burial benefits. Accordingly, the Board's decision will be affirmed.

## I. BACKGROUND

The veteran, Charlie N. Wingard, served honorably on active duty in the U.S. Air Force from 1942 to 1963. R. at 308-09. In December 1989, a VA regional office (RO) determined that Mr. Wingard's "s[tatus] p[ost] hernioplasty, right inguinal" was service connected, but upon finding "no evidence of recurrence" assigned a 0% disability evaluation under 38 C.F.R. § 4.114, Diagnostic Code (DC) 7338 (1989).[2] R. at 304. On December 15, 1989, VA informed Mr. Wingard that VA "cannot grant your claim for payment of disability benefits." R. at 302. VA explained that Mr. Wingard's "[inguinal hernia] is service[]connected but is less than 10% disabling and compensation is not payable." *Id*.

Mr. Wingard died in September 2005 from non-service-connected conditions. R. at 102. It is undisputed that at the time of his death, he did not have any claims pending, he was not in receipt of pension, and his only service-connected condition was the inguinal hernia, rated 0% disabling.

---

[2] Under DC 7338, a 60% disability rating is authorized if the postoperative inguinal hernia is, among other things, large and recurrent; a 30% disability rating is authorized if the postoperative inguinal hernia is, among other things, small and recurrent; a 10% disability rating is authorized if the inguinal hernia is "[p]ostoperative recurrent, readily reducible and well supported by truss or belt"; and a 0% disability rating is authorized if the inguinal hernia is "[n]ot operated, but remediable," or "[s]mall, reducible, or without true hernia protrusion." 38 C.F.R. § 4.114, DC 7338 (1989).

In December 2005 and May 2006, the appellant submitted an application for non-service-connected burial benefits. R. at 93-94, 100-01. On May 24, 2006, VA denied the claim because, among other things, "[t]he veteran was not in receipt of nor entitled to disability compensation or pension on the date of death." R. at 91-92. The appellant reapplied for burial benefits on June 2, 2008. R. at 78-79. On July 11, 2008, VA again denied her claim. R. at 72-73. The letter stated, in pertinent part, that the claim for burial benefits was denied because, at the time of his death, Mr. Wingard "wasn't receiving a monthly [VA] disability check," and "wasn't receiving military retired pay in place of a VA disability check." R. at 72. The appellant appealed to the Board. R. at 31-32, 35-58, 68-70.

On January 11, 2011, the Board issued the decision here on appeal denying non-service-connected burial benefits under 38 U.S.C. § 2302 and 38 C.F.R. §3.1600(b) (2010). R. at 3-11. The Board found that the criteria for non-service-connected burial benefits had not been met because, among other things, Mr. Wingard was not "in receipt of any compensation or pension" at the time of his death. R. at 5, 7; *see* 38 U.S.C. § 2302(a)(1). The Board stated: "[A]lthough [Mr. Wingard] has been service-connected for residuals of an inguinal hernia since 1989, this disability has always been at a noncompensable level. Therefore, he was not in receipt of any disability compensation." R. at 7-8. This appeal followed.

## II. ANALYSIS

When a veteran dies as a result of a non-service-connected disability, the Secretary may pay a sum not exceeding $300 to the person who bore the cost of the veteran's burial and funeral expenses, if the veteran "at the time of death was in receipt of compensation (or but for the receipt of retirement pay would have been entitled to compensation) or was in receipt of pension." 38 U.S.C. § 2302(a)(1); *see also* 38 C.F.R. § 3.1600(b)(1) (2013). In this case, there is no dispute that Mr. Wingard's only service-connected disability was rated noncompensable at the time of his death, and therefore, he was not receiving disability compensation at the time of his death. *See* 38 U.S.C. § 101(13) (defining "[c]ompensation" as a "monthly payment made by the Secretary to a veteran because of service-connected disability").

Nonetheless, the appellant argues that she satisfies the criteria for non-service-connected burial benefits because (1) the phrase "in receipt of compensation" in section 2302(a)(1) is

3

ambiguous, and is most reasonably interpreted as including those veterans who were *entitled to receive* compensation at death, and (2) Mr. Wingard was entitled to receive compensation at the time of his death, because he was assigned a noncompensable evaluation for his service-connected disability despite the plain and unambiguous language of 38 U.S.C. §§ 1110 and 1155 prohibiting such an evaluation. Appellant's Brief (Br.) at 5-15, 18-19. The appellant also challenges 38 U.S.C. § 2302(a)(1) on equal protection grounds, asserting that there is no rational basis for distinguishing between veterans with service-connected disabilities who are receiving compensation, and veterans who have service-connected disabilities and were entitled to receive compensation as a matter of law. *Id.* at 15-18.

The Secretary disputes each of the appellant's contentions on the merits. Additionally, the Secretary asserts that (1) the appellant lacks standing to challenge, and the Court lacks jurisdiction to review, the assignment of a noncompensable rating for Mr. Wingard's service-connected disability in a final 1989 rating decision; and (2) the Court lacks jurisdiction to consider the appellant's challenge to regulations permitting the assignment of noncompensable ratings, *see*, *e.g.*, 38 C.F.R. § 4.114, DC 7338 (1989 & 2013) (providing for a 0% evaluation for hernia conditions that are "[n]ot operated, but remediable," or "[s]mall, reducible, or without true hernia protrusion"); 38 C.F.R. § 4.31 (2013) (providing for a 0% evaluation "where the schedule does not provide a zero percent evaluation for a diagnostic code" and "the requirements for a compensable evaluation are not met"), because the Court may not review the content of the rating schedule or the Secretary's actions in adopting or revising the rating schedule. Secretary's Br. at 10-16.

Before turning to the merits of the appellant's arguments, the Court must first ensure that it has jurisdiction and that the appellant has standing to pursue this appeal.

## A. Standing and Jurisdiction

### i. Assignment of a Noncompensable Rating

Although not bound by Article III justiciability requirements, this Court has decided that it will refrain from deciding cases that do not present an actual case or controversy. *See Mokal v. Derwinski*, 1 Vet.App. 12, 13 (1990). Generally, courts conduct the "standing" inquiry to verify whether the Court is presented with a legitimate "case or controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Zevalkink v. Brown*, 102 F.3d 1236, 1243 (Fed. Cir. 1996). Throughout the inquiry, the appellant bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife*,

504 U.S. 555, 561 (1992); *Bethea v. Derwinski*, 2 Vet.App. 252, 255 (1992) (appellant bears burden of establishing jurisdiction).

To meet Article III's standing requirement, the appellant must establish three elements. *Lujan*, 504 U.S. at 560. First, the appellant must have suffered an "'injury in fact'" that is both "concrete and particularized." *Id*. (citing *Allen v. Wright*, 468 U.S. 737, 756 (1984)). "The injury alleged must be . . . distinct and palpable, . . . and not abstract or conjectural or hypothetical." *Allen*, 468 U.S. at 751 (citations omitted); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013); *Waterhouse v. Principi*, 3 Vet.App. 473, 474-76 (1992). The second element stipulates that there must be a causal relationship between the injury and the challenged action. *Lujan*, 504 U.S. at 560. The third element states that it must be "likely" that the injury will be "'redressed by a favorable decision.'" *Id*. (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

In addition to Article III standing, an appellant in this Court must demonstrate "statutory standing." *Padgett v. Peake*, 22 Vet.App. 159, 164 (2008). In other words, a party must be "adversely affected" by the Board decision appealed. *Id*.; *see* 38 U.S.C. § 7266(a) (to obtain judicial review of a Board decision, "a person adversely affected by such decision shall file a notice of appeal").

In this case, the Secretary contends that the appellant lacks standing to challenge Mr. Wingard's noncompensable disability rating as set forth in *Haines v. West*, 154 F.3d 1298, 1301-02 (Fed. Cir. 1998) (holding that there is no statutory basis for permitting a veteran's survivor to pursue a motion to reverse or revise a prior final decision on the basis of clear and unmistakable error), and that this Court lacks jurisdiction to consider the assignment of a noncompensable rating for the veteran's service-connected disability. However, the Secretary fails to understand that the appellant does not seek to relitigate the noncompensable evaluation assigned to Mr. Wingard. Rather, the appellant challenges the Board's denial of burial benefits based on its finding that Mr. Wingard was not in receipt of disability compensation at the time of his death by attacking VA's authority to assign noncompensable ratings. *See* Appellant's Br. at 5-15. According to the appellant, if VA lacked the authority to assign a noncompensable rating, then Mr. Wingard was entitled to receive compensation at the time of his death and the Board's decision to deny burial benefits would rest on an erroneous premise. *Id*. at 9-10; Reply Br. at 6-10. Because the denial of burial benefits is the

subject of the Board decision on appeal, the Court has jurisdiction over that decision. 38 U.S.C. § 7252(a); *see Howard v. Gober*, 220 F.3d 1341, 1344 (Fed. Cir. 2000).

On this view of the appellant's arguments, the Court also concludes that the appellant has standing to pursue this appeal. The appellant is harmed by the Board's refusal to award non-service-connected burial benefits to which she claims she is entitled as a result of her payment of Mr. Wingard's funeral expenses. *See* R. at 6 (Board finding that the appellant is the party with standing to pursue the claim for burial benefits); *see also Lujan*, 504 U.S. at 560. The Board's decision was adverse to the appellant's application for burial benefits, and thus it satisfies section 7266(a)'s adverse-effect and Article III's injury-in-fact and causation requirements. *Id.*; *Padgett, supra*. Were the Court to reverse the Board's decision, the appellant would be eligible for burial benefits and the injury induced by the Board decision would be redressed. *Lujan*, 504 U.S. at 560. Thus, the appellant also meets Article III's redressability element by demonstrating that the Court has the authority to undo the alleged harm wrought by the Board decision. *See generally Lujan*, 504 U.S. at 561-62 (if the appellant is the "object of the [government] action (or forgone action) at issue," there is "little question that the [government] action or inaction caused him injury, and that a judgment preventing or requiring the action will redress it.").

Moreover, because the appellant expressly disclaims any attempt to obtain disability compensation as a survivor of the deceased veteran (*see* Appellant's Br. at 9 n.3 ("Ms. Wingard is not now seeking as part of this appeal entitlement to past-due or accrued benefits that otherwise were due to Mr. Wingard during his lifetime.")), the Secretary's analogy to the standing inquiry in *Haines* is distinguishable, and the Secretary's characterization of the appellant's claim as a disguised motion to reverse or revise a final agency decision on the basis of clear and unmistakable error is untenable. *See Haines*, *supra*; *see also Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1379 n.13 (Fed. Cir. 2001) (distinguishing *Haines* where survivor attacked a final decision for purposes of dependency and indemnity compensation, rather than accrued benefits).

In sum, the appellant does not challenge the noncompensable evaluation assigned in the 1989 rating decision. Rather, the appellant challenges the Board's decision that she is not entitled to burial benefits, and, as a component of her challenge, the appellant seeks to show, contrary to the Board's finding, that Mr. Wingard was "in receipt" of compensation as required by section 2302(a)(1) and § 3.1600(b)(1). Accordingly, the Court has jurisdiction to review the Board's January 11, 2011,

decision, and the appellant has standing to challenge whether Mr. Wingard was "in receipt" of compensation for purposes of establishing her entitlement to burial benefits.

*ii. Challenge to Regulations Assigning Noncompensable Evaluations*

The Court's jurisdictional statute, 38 U.S.C. § 7252, excludes from the Court's review "the schedule of ratings for disabilities adopted under [38 U.S.C. §] 1155" or "any action of the Secretary in adopting or revising that schedule." 38 U.S.C. § 7252(b). The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stated in *Wanner v. Principi*: "[T]he schedule of ratings consists of both the ratings and the injuries for which ratings are provided. The Secretary's discretion over the schedule, including procedures followed and content selected, is insulated from judicial review, with one recognized exception limited to constitutional challenges." 370 F.3d 1124, 1131 (Fed. Cir. 2004). The Federal Circuit further noted that "review of the content of the rating schedule is indistinguishable from review of 'what should be considered a disability.'" *Id*. *Compare Smith v. Nicholson*, 451 F.3d 1344, 1346-47 (Fed. Cir. 2006) (Court possessed jurisdiction to review an interpretation of the language in DC 6260 and 38 C.F.R. § 4.25(b)), *with Byrd v. Nicholson*, 19 Vet.App. 388, 394 (2005) (Court lacked jurisdiction to hear appellant's challenge that periodontal disease should constitute a disease for VA compensation purposes).

The appellant's challenge to the existence of a noncompensable disability rating is not precluded by the Court's inability to review the schedule of ratings for disabilities adopted under section 1155. The crux of the appellant's argument is that regulations such as § 4.31 conflict with section 1155's mandate that the Secretary "shall adopt and apply a schedule or ratings," which "shall be constructed so as to provide *ten grades of disability and no more*." 38 U.S.C. § 1155 (emphasis added). She does not seek review of what *should* be a disability or the appropriate *rating* to be assigned a particular disability – only that the Secretary lacks the authority to create, what she views as "an eleventh, unauthorized grade of disability." Appellant's Br. at 7; *see Martinak v. Nicholson*, 21 Vet.App. 447, 452 (2007) (rejecting the Secretary's argument that the Court lacked jurisdiction to hear a challenge to regulations prescribing the policies and procedures for conducting a VA medical examination, noting that "[t]he rating schedule consists only of those regulations that establish disabilities and set forth the terms under which compensation should be provided"). On this view, the Court agrees that the prohibition on judicial review of the content of the rating schedule does not preclude the Court from answering this question.

B. Validity of Regulations Assigning Noncompensable Evaluations

The appellant argues that the Secretary's regulations, which provide for the assignment of noncompensable evaluations, are contrary to the plain and unambiguous language of 38 U.S.C. §§ 1110 and 1155. Appellant's Br. at 5-9. In support of her argument, the appellant avers that section 1110 requires the United States to pay disability compensation to *all* veterans who suffer from service-connected disability,[3] noting that section 1110 commands that the United States "*will pay* to any veteran thus disabled . . . compensation as provided in this subchapter." 38 U.S.C. § 1110 (emphasis added); Appellant's Br. at 7. To effectuate this mandate, the appellant asserts that Congress authorized the Secretary to create a schedule for rating disabilities, 38 U.S.C. § 1155, but mandated that the schedule "shall be constructed so as to provide ten grades of disability and no more." *Id*. at 6. The appellant contends that Congress left "no room for interpretation or doubt" when it explicitly set forth the 10 grades of disability authorized – 10% to 100%, in ten percentile increments. *Id*. Because Congress did not authorize a "'zero percent' grade of disability in section 1155 or in any other statute," the appellant urges the Court to strike down the Secretary's assignments of "an eleventh, unauthorized grade of disability." *Id*. at 6-7, 9.

The Secretary counters that nothing in the plain language of section 1110 or 1155 prohibits VA from assigning a 0% rating when a service-connected condition does not result in a reduction in earning capacity. Secretary's Br. at 17-19; *see* 38 U.S.C. § 1155 ("The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations."). To the extent that Congress left a gap for VA to fill, the Secretary asserts that "allowing for the award of noncompensable ratings is reasonable and consistent with the overall statutory framework of title 38." Secretary's Br. at 19.

*i. Plain Language*

"'Statutory interpretation begins with the language of the statute, the plain meaning of which we derive from its text and structure.'" *Myore v. Nicholson*, 489 F.3d 1207, 1211 (Fed. Cir. 2007) (quoting *McEntee v. M.S.P.B.*, 404 F.3d 1320, 1328 (Fed. Cir. 2005)); *see Sharp v. Shinseki*,

---

[3] For purposes of title 38, Congress defined the term "[s]ervice-connected" in 38 U.S.C. § 101(16). "The term 'service-connected' means, with respect to disability or death, that such disability was incurred or aggravated, or that the death resulted from a disability incurred or aggravated, in line of duty in the active military, naval, or air service." 38 U.S.C. § 101(16).

23 Vet.App. 267, 271 (2009); *see also McGee v. Peake*, 511 F.3d 1352, 1356 (Fed. Cir. 2008); *Gardner v. Derwinski*, 1 Vet.App. 584, 586 (1991) ("Determining a statute's plain meaning requires examining the specific language at issue and the overall structure of the statute." (citing *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 403-05 (1998))), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994). If "the plain meaning of a statute is discernable, that 'plain meaning must be given effect,'" *Johnson v. Brown*, 9 Vet.App. 369, 371 (1996) (quoting *Tallman v. Brown*, 7 Vet.App. 453, 460 (1995)), unless a "'literal application of [the] statute will produce a result demonstrably at odds with the intention of its drafters,'" *Gardner*, 1 Vet.App. at 586-87 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which it is used, and the broader context of the statute itself." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

In reviewing "an agency's construction of the statute which it administers," a court must first ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If so, the court and the agency must "give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. However, if the statute is silent or ambiguous with respect to the specific issue, the question becomes whether the agency's interpretation is based on a permissible construction of the statute. *Id*. at 843. The agency's interpretation will not be set aside unless it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A); *Breniser v. Shinseki*, 25 Vet.App. 64, 72 (2011).

The Court must first review the language of 38 U.S.C. §§ 1110 and 1155 to determine whether Congress directly spoke to the precise question at issue. Section 1110 states:

> For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service, during a period of war, the United States will pay to any veteran thus disabled and who was discharged or released under conditions other than dishonorable from the period of service in which said injury or disease was incurred, or preexisting injury or disease was aggravated, compensation as provided in this subchapter, but no compensation shall be paid if the disability is a result of the veteran's own willful misconduct or abuse of alcohol or drugs.

9

38 U.S.C. § 1110.

The plain language of the statute unequivocally states that "the United States *will pay* to any veteran *thus disabled* . . . compensation *as provided in this subchapter*." 38 U.S.C. § 1110 (emphasis added). Thus, the Court must further examine the subchapter. Notably, section 1155 states:

> The Secretary shall adopt and apply a schedule of *ratings of reductions in earning capacity* from specific injuries or combination of injuries. The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations. The schedule shall be constructed so as to provide *ten grades of disability and no more, upon which payments of compensation shall be based*, namely, 10 percent, 20 percent, 30 percent, 40 percent, 50 percent, 60 percent, 70 percent, 80 percent, 90 percent, and total, 100 percent. The Secretary shall from time to time readjust this schedule of ratings in accordance with experience. However, in no event shall such a readjustment in the rating schedule cause a veteran's disability rating in effect on the effective date of the readjustment to be reduced unless an improvement in the veteran's disability is shown to have occurred.

38 U.S.C. § 1155 (emphasis added).

On its face, section 1155 authorizes the Secretary "to adopt and apply a schedule of *ratings of reductions in earning capacity* . . . based, as far as practicable, upon the average impairments of earning capacity." *Id.* (emphasis added). The appellant's argument that the Secretary is not authorized to assign a noncompensable evaluation for a service-connected disability is premised on the language of section 1155, which prescribes that the schedule provide for "ten grades of disability *and no more*." 38 U.S.C. § 1155 (emphasis added). However, that mandate is modified by the phrase immediately following it – "*upon which payment of compensation shall be based*." *Id.* (emphasis added). The meaning of a statutory word or phrase cannot be determined in isolation, but must be drawn from the context in which it is used. *See Holloway v. United States,* 526 U.S. 1, 6 (1999) ("In interpreting the statute at issue, '[w]e consider not only the bare meaning' of the critical word or phrase 'but also its placement and purpose in the statutory scheme.'" (quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995))).

Thus, all that can be gleaned from the plain language of section 1155 is that the Secretary must adopt and apply a schedule of ratings of reductions in earning capacity and may only establish 10 grades of disability upon which *the payment of compensation* shall be based. The Court holds

that the plain language of section 1155 does not state that all reductions in earning capacity must result in the payment of compensation, nor does it prohibit the Secretary from establishing other grades of disability that do *not* result in the *payment of compensation*. Read together, nothing in the plain language of sections 1110 and 1155 prohibits the Secretary from recognizing that a condition is "service-connected," but noncompensable because it does not rise to the level of causing, at a minimum, a 10% reduction in earning capacity.

### ii. Legislative History

Although we conclude that the plain language of the statute does not prohibit the assignment of a rating that does not result in the payment of compensation, the Court will consider the legislative history to determine whether a clear intent contrary to the plain meaning exists. *See Glaxo Operations U.K. Ltd. v. Quigg*, 894 F.2d 392, 395 (Fed. Cir. 1990) ("[E]ven when the plain meaning of the statutory language in question would resolve the issue before the court, the legislative history should usually be examined at least 'to determine whether there is a *clearly expressed* legislative intention contrary to the statutory language.'" (quoting and adding emphasis to *Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 629 (Fed. Cir.1989))).

At the outset, an examination of the World War Veterans' Act of 1924 reveals that not all disabilities resulting from military service resulted in the payment of compensation. Pub. L. No. 68-242, ch. 320, 43 Stat. 607 (Jun. 7, 1924). Section 200 of the World War Veterans' Act of 1924 contained language similar to that of 38 U.S.C. § 1110, mandating – "[f]or death or disability resulting from personal injury suffered or disease contracted in the military or naval service . . . , or for aggravation . . . the United States *shall pay . . . compensation as hereinafter provided*." *Id*. at tit. II, § 200, 43 Stat. at 615-16 (emphasis added). However, section 202(2) of the World War Veterans' Act of 1924 provided: "[I]f and while the disability is rated as partial and temporary, the monthly compensation shall be a percentage of the compensation that would be payable for his total and temporary disability, equal to the degree of the reduction in earning capacity resulting from the disability, *but no compensation shall be payable for a reduction in earning capacity rated at less than 10 per centum*." *Id*. at tit. II, § 202(2), 43 Stat. at 618 (emphasis added); *see also id.* at tit. II, § 202(4), 43 Stat. at 618. Thus, in 1924, Congress explicitly provided that no compensation shall be paid for disability that resulted in a reduction in earning capacity rated at less than 10%.

The World War Veterans' Act of 1924 was superceded by the Economy Act of 1933. Act of Mar. 20, 1933, Pub. L. No. 73-2, 48 Stat. 8. Title I of the Economy Act granted the President broad authority to define the substance and procedures of the veterans benefits system through the issuance of regulations. *Id*. at tit. I, 48 Stat. at 8-12. Section one identified the classes of persons who may be paid, including "[a]ny person who served in the active military or naval service and who is disabled as a result of disease or injury or aggravation of a preexisting disease or injury incurred in line of duty of such service." *Id*. at tit. I, 48 Stat. at 8. Section two set forth the minimum and maximum monthly rates of pension, which may have been paid for disability or death, and section three authorized the President "to prescribe by regulation the minimum degrees of disability and such higher degrees of disability, if any, *as in his judgment should be recognized* and prescribe the rate of pension payable for each such degree of disability." *Id*. at tit. I, 48 Stat. at 9 (emphasis added).

Pursuant to this authority, the President promulgated a new set of regulations by Executive order. Much of the language contained in sections 1110 and 1155 can be traced verbatim to these regulations. Veterans Regulation 1 set forth the basic entitlement to benefits, and included similar language mandating that "the United States *will pay compensation* to any person thus disabled and who was honorably discharged a pension *as hereinafter provided*[,] but no pension shall be paid if the disability is the result of the person's own misconduct." *See* Exec. Order No. 6089 (Mar. 31, 1933) (emphasis added). Veterans Regulation 3 authorized the Administrator of Veterans' Affairs to create a schedule for rating disabilities. *See* Exec. Order No. 6091 (Mar. 31, 1933). Initially, the President directed that the schedule shall be constructed so as to provide "*five grades of disability and no more* upon which the payments of pension shall be based, namely," 10%, 25%, 50%, 75%, and total. *Id.* (emphasis added).

Veterans Regulations 1 and 3 were superceded by Regulations 1(a) and 3(a). *See* Exec. Order Nos. 6156 and 6157 (June 6, 1933). Pertinent to our discussion, Regulation 3(a) authorized the Administrator of Veterans' Affairs to "adopt and apply a schedule of ratings of reductions in earning capacity from specific injuries or combination of injuries. The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations." Exec. Order No. 6157, *supra*. Just like section 1155, Executive Order 6157 directed the Administrator to construct the schedule "so as to provide *ten grades of disability and no more*

12

*upon which payments of pension* shall be based, namely, ten per cent . . . [through] total, one hundred per cent."  *Id.* (emphasis added).

By providing for 10 grades of disability, starting at 10%, upon which payments of pension shall be based, the President established the minimum degrees of disability "*as in his judgment should be recognized*," and consistent with the World War Veterans' Act of 1924, limited the payment of compensation for reductions in earning capacity to disabilities that were at least 10% disabling.  Pub. L. No. 73-2, tit. I, § 3, 48 Stat. at 8 (Mar. 20, 1933); *see* Pub. L. No. 68-242, ch. 320, tit. II, § 202(2), (4), 43 Stat. at 618 (June 7, 1924).

Moreover, the VA's 1945 Rating Schedule exhibited this understanding of the law, as it specifically provided for the assignment of 0% evaluations under numerous DCs, *see, e.g.*, VA Schedule for Rating Disabilities 33-50, 61, 73, 93, DCs 5172, 5227, 5260, 5276, 5278, 5291, 5293, 5301-5323, 6203, 6600, 7338 (1945); *see also* VA Schedule for Rating Disabilities 12-14, 17, 25, 26, DCs 3149, 1803, 1814, 2034, 2005 (1933), as well as a provision permitting no-percent evaluations where the minimum rating schedule criteria were not met.  *See* 38 C.F.R. § 2.1158(b) (1946) ("For the purposes of the 1933 and 1945 schedules, a disability under any diagnostic classification which does not meet the minimum rating schedule standard under that classification will be rated as no percent, except for purposes of Civil Service preference, in which event an evaluation of less than ten percent may be made.").[4]

In 1949, Congress reflected its awareness, and indeed even authorized, an amendment to Veterans Regulation 3(a), which provided for the assignment of a 0% rating when there was no longer continued disability for arrested tuberculosis.  *See* Pub. L. No. 81-339, ch. 654, § 2, 63 Stat.

---

[4]  Prior to 1964, VA's Schedule for Rating Disabilities was not published as part of title 38 of the Code of Federal Regulations.  Section 4.31 was added to the 1945 Schedule for Rating Disabilities in October 1961.  *See* VA Schedule for Rating Disabilities 15 para. 31 (effective Oct. 1, 1961) (providing that "[i]n every instance where the minimum schedular evaluation requires residuals and the schedule does not provide a no-percent evaluation, a no-percent evaluation will be assigned when the required residuals are not shown"); *see also* 29 Fed. Reg. 6718 (May 22, 1964).  The Secretary amended the language of § 4.31 in 1993, "to clarify the VA's interpretation of the intent of the regulation."  58 Fed. Reg. 52,017-18 (Oct. 6, 1993).  Since 1993, § 4.31 provides: "In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met."  38 C.F.R. § 4.31.

732 (Oct. 10, 1949) (providing for staggered minimum disability ratings for arrested tuberculosis – including, as follows: "[F]ollowing moderately advanced lesions, the permanent rating, after eleven years, shall be 20 per centum, provided there is continued disability, dyspnea on exertion, impairment of health, and so forth; *otherwise the rating shall be zero per centum*[.]" (emphasis added)); *see also* H.R. REP. NO. 81-1063, at 13 (1949) (Comm. Rep.) (noting "[u]nder the Schedule for Rating Disabilities, 1945, ratings for disabilities from tuberculosis, like any other disease, are based upon the actual disability found to exist"); *Increase Compensation for World War I Presumptive Service-Connected Cases, Provide Minimum Ratings for Service-Connected Arrested Tuberculosis, Increase Compensation Rates, Liberalize Requirement for Dependency Allowances, Facilitate Cooperation with the Veterans' Administration, and Redefine "Line of Duty" and "Willful Misconduct": Hearing on H.R. 63, 280, 290, 292, 896, 900, 901, 903, 906, 908, 909, 910, 911, 912, 923, 928, 937, 1157, 1414, 1415, 1416 Before the Comm. On Veterans' Affairs*, 81st Cong. 688 (statement of T.O. Kraabel, Director, National Rehabilitation Comm., The American Legion) ("Unless disabling residuals of tuberculosis are present, we believe there should be no handicap in employment and thus the rating, would be, and should be, zero percent.").

Finally, in 1958, Congress consolidated and reorganized all laws administered by the Veterans' Administration into title 38 of the U.S. Code. Act of Sept. 2, 1958, Pub. L. No. 85-857, 72 Stat. 1105. Regulation 3(a) was reenacted without substantive modification. *Id*. at §§ 355, 356, 72 Stat. at 1125. Hence, in 1958, when sections 1110 and 1155 (then sections 301 and 355) were consolidated without substantive modification, there can be no doubt that Congress was aware of the Secretary's construction. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without [relevant] change."); *see generally NLRB v. Bell Aerospace Co. Div. of Taxation*, 416 U.S. 267, 275 (1974) (noting that an established principle of statutory construction permits a court to "accord great weight to the long standing interpretation placed on a statute by an agency charged with its administration . . . especially . . . where Congress has reenacted the statute without pertinent change"); *but see Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) ("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.").

To this date, the current rating schedule specifically provides for the assignment of 0% evaluations under numerous DCs, *see, e.g.*, 38 C.F.R. §§ 4.71a, DCs 5229, 5230, 5261, 5276, 5282, 5298; 4.73, DCs 5301-08, 5310-5323; 4.104, DCs 7112, 7120, 7121; 4.114, DCs 7301, 7314, 7318, 7338 (2013), and VA has essentially continued its regulation regarding 0% evaluations (38 C.F.R. § 2.1158(b) (1946)) in today's 38 C.F.R. § 4.31 (2013).

Overall, having reviewed the legislative history, the Court is not aware of any clear legislative intent contrary to our reading of the statutes, nor has the appellant provided us with any.

### iii. Secretary's Interpretation

As noted above, when a service-connected disability does not rise to the level of causing, at a minimum, a 10% reduction in earning capacity, the plain language of sections 1110 and 1155 does not explicitly prohibit the Secretary from establishing grades of disability that do not result in the payment of compensation. Thus, the Court concludes that neither section 1110 nor section 1155 speaks directly to the specific issue before the Court, i.e., what action, if any, must the Secretary take on a veteran's claim for disability compensation where the disabling condition does not cause a reduction in earning capacity that is at least 10% disabling, but otherwise meets the requirements for establishing service connection? *See generally Shedden v. Principi*, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004) (establishing service connection generally requires evidence of (1) a current disability; (2) an in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the present disability); *Hickson v. West*, 12 Vet.App. 247, 252 (1999).

Because the statutes are silent with respect to the precise question at issue, the Court will defer to the Secretary's interpretation, if it is reasonable. *Chevron*, 467 U.S. at 843-44. In this case, the Secretary's interpretation of section 1155 permits the assignment of a 0% evaluation for certain disabilities in the schedule, *see, e.g.*, 38 C.F.R. §§ 4.71a, DCs 5229, 5230, 5261, 5276, 5282, 5298; 4.73, DCs 5301-08, 5310-5323; 4.104, DCs 7112, 7120, 7121; 4.114, DCs 7301, 7314, 7318, 7338 (2013), and otherwise permits such assignment "when the requirements for a compensable evaluation are not met." 38 C.F.R. § 4.31.

Relying on 38 U.S.C. § 501(a)(4), which grants "[t]he Secretary. . . authority to prescribe all rules and regulations which are necessary and appropriate to carry out the laws administered by the Department and are consistent with those laws, including – . . . the manner and form of

adjudications and awards," the Secretary urges the Court to uphold his interpretation, asserting that "allowing for the award of noncompensable ratings is reasonable and consistent with the overall statutory framework of title 38." Secretary's Br. at 19. The Secretary explains that § 4.31 "provides a vehicle to acknowledge the existence of a service-related disease or injury, which may in the future warrant compensation if an increase in the degree of disability occurs, . . . or serve as a conduit to establish eligibility for other VA benefits which require service-connected but not compensable disability." Secretary's Br. at 18.

In other words, recognition by VA that a veteran has a service-connected condition, albeit noncompensable, enables that veteran to file a claim for an increased rating if his disability later increases in severity (or enables such a claim to be raised by hospital or examination reports[5]), rather than requiring the veteran to present new and material evidence to reopen his claim generally without assistance,[6] and then to establish anew each of the elements for service connection. *See Colayong v. West*, 12 Vet.App. 524, 532 (1999) ("[C]laim for an increased rating is . . . not subject to the provisions of 38 U.S.C. §§ 7104(b) and 7105(c) prohibiting reopening of previously disallowed claims except upon new and material evidence under 38 U.S.C. § 5108."); *Proscelle v. Derwinski*, 2 Vet.App. 629, 631-32 (1992). Additionally, as noted by the Secretary, recognition by VA that a veteran has a service-connected condition, albeit noncompensable, can serve to qualify the veteran for certain VA medical care and contract medical care under chapter 17 of title 38, U.S.

---

[5] The Secretary's regulations provide that an informal claim for an increased disability rating "'will' be initiated by a report of examination or hospitalization for previously established service-connected disabilities." *Norris v. West*, 12 Vet.App. 413, 417 (1999); *see* 38 C.F.R. § 3.157(b) (2013); *see also Massie v. Shinseki*, 25 Vet.App. 123, 132 (2011) ("It is self-evident that the purpose of § 3.157(b)(1) is to avoid requiring a veteran to file a formal claim for an increased disability rating where the veteran's disability is already service connected and the findings of a VA report of examination or hospitalization demonstrate that the disability has worsened.").

[6] *See Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs*, 345 F.3d 1334, 1353 (Fed. Cir. 2003) (noting that 38 U.S.C. § 5103A "does not require VA to assist claimants attempting to reopen," but that "VA has chosen to assist claimants attempting to reopen in limited circumstances").

Code. *See, e.g.*, 38 U.S.C. §§ 1703(a)(1)(A), 1704(1)(B), 1710(a)(1)(A); *see also* 38 C.F.R. § 17.36(b)(7)(I), (iii) (2013).[7]

Because Congress did not expressly prohibit the assignment of ratings that do not result in the payment of compensation, and the Secretary has broad rulemaking authority to prescribe regulations necessary to carry out the laws administered by VA, the Court will defer to the Secretary's interpretation since it is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. In keeping with VA's veteran-friendly system, the Secretary's policy of recognizing that a disability is "service connected," but not compensable, eases the claims process for veterans to later establish that the disability increased in severity or to establish entitlement to other benefits that require a service-connected, but not a compensable, disability. *See Evans v. Shinseki*, 25 Vet.App. 7, 14 (2011) (noting the "veteran-friendly, non-adversarial [VA benefits] process").

The Court concludes – after reviewing the plain language of sections 1110 and 1155 and their legislative history, and having determined that the assignment of noncompensable evaluations are reasonable exercises of the Secretary's rulemaking authority – that the appellant's argument is unavailing.

### C. Statutory Interpretation of 38 U.S.C. § 2302(a)(1)

Because the Court holds above that the appellant does not prevail on her argument that Mr. Wingard was entitled to receive disability compensation at the time of his death, a determination regarding the meaning of "in receipt of compensation" in section 2302(a)(1) is unnecessary to the result in this case. *Cf. Kansas v. Colorado*, 556 U.S. 98, 99 (2009) ("[a]ssuming for the sake of argument that Kansas is correct in its interpretation of the statutes at issue in this matter" in order to reject Kansas's claim on the merits); *Montague v. NLRB*, 698 F.3d 307, 313 (6th Cir. 2012) (court "need not reach" argument that petitioners are not "person[s] aggrieved" under the statute where

---

[7] Consistent with the Secretary's interpretation, review of the record in this case shows that on December 15, 1989, VA informed Mr. Wingard, as follows: "We *cannot grant your claim for payment of disability benefits*. The disability listed below [inguinal hernia] is service-connected but is less than 10% disabling and compensation is not payable." R. at 302 (emphasis added). However, the letter also informed Mr. Wingard that "[t]here is entitlement to necessary treatment by the VA for any service-connected disability," and that he should bring the letter with him when he applies for treatment. *Id.*

petition can be denied on the merits); *United States v. Shandell*, 800 F.2d 322, 323-24 (2d Cir. 1986) ("Assuming, without deciding, that appellant's interpretation of the statute is correct, a proposition which is open to debate, his [underlying] contention nonetheless is without merit."). Otherwise stated, even assuming the appellant is correct that "in receipt of compensation" should reasonably be construed to include a veteran who at the time of death was *entitled to receive* compensation, her argument, that assigning Mr. Wingard a noncompensable evaluation was erroneous as a matter of law, fails, and therefore she does not establish that he was entitled to receive compensation at the time of his death.

Thus, although appellant's counsel requested that the Court remand this case to the Board for an initial statutory interpretation of section 2302(a)(1), the Court will decline that request. *See Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991) (remand unnecessary where it would impose additional burdens on the Board with no benefits flowing to the veteran); *see also Maggitt v. West*, 202 F.3d 1370, 1377-78 (Fed. Cir. 2002) (Court "has jurisdiction to hear arguments presented to it in the first instance, provided it otherwise has jurisdiction over the veteran's claim," and the determination whether to entertain an argument raised for the first time at the Court is a matter of discretion); *Butts v. Brown*, 5 Vet.App. 532, 539 (1993) (en banc) (stating that the Court reviews "questions of law de novo without any deference to the [Board's] conclusions of law").

Moreover, although the Secretary argues that the question of the statutory interpretation of section 2302(a)(1) has been decided in *Osborne v. Principi*, 3 Vet.App. 368, 369 (1992), the Court in *Osborne* was not faced with the issue of statutory interpretation the appellant raises here. Thus, though the facts in *Osborne* are similar to the facts here (i.e., in *Osborne* the veteran's only service-connected disability at the time of death was rated noncompensable), *Osborne* is not binding precedent on this question. *See United States v. County of Cook, Illinois*, 170 F.3d 1084, 1088 (Fed. Cir. 1999) (prior cases that do not squarely address an issue are not binding precedent); *Nat'l Cable Television Ass'n v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1581 (Fed. Cir. 1991) ("When an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises.").

## D. Equal Protection

As stated previously, the appellant also argues that there is no rational basis for 38 U.S.C. § 2302(a)(1) to distinguish between veterans with service-connected disabilities who are actually

in receipt of compensation, and those who have service-connected disabilities and were entitled to receive compensation as a matter of law. Appellant's Br. at 15-18. The Secretary responds that the appellant "has not established that the requirement does not bear a fair and substantial relation to the object of the legislation," or that she is "similarly circumstanced to such persons who receive the benefit based on the fact that the deceased veteran was receiving VA compensation or pension." Secretary's Br. at 29; *see Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457 (1988) ("Unless a statute . . . interferes with a fundamental right or discriminates against a suspect class, it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose."); *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

Because the Court holds above that the appellant does not prevail on her argument that Mr. Wingard was entitled to receive disability compensation at the time of his death, even assuming the statute distinguishes between veterans who at the time of death were receiving compensation and those who were only *entitled to receive* compensation, the appellant does not establish that Mr. Wingard was similarly situated to those in either classification. *See Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection."). Therefore, the appellant demonstrates no equal protection violation. *See Cleburne*, *supra*.

### III. CONCLUSION

Because there is no dispute that Mr. Wingard was not "in receipt" of compensation at the time of death, 38 U.S.C. § 2302(a)(1), and the appellant has not shown that Mr. Wingard was *entitled to receive* compensation at the time of death, the appellant has not demonstrated prejudicial error in the Board's decision to deny non-service-connected burial benefits.

Accordingly, the Board's January 11, 2011, decision is AFFIRMED.